IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION

| | | |
|---|---|---|
| TINA HEATH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action |
| | : | No. 3:21-CV-119 (CAR) |
| J.S. HELWIG & SON, L.L.C.; and | : | |
| JEFFREY BLACK, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT
## AND MOTIONS TO EXCLUDE EXPERT TESTIMONY

This case stems from a hit-and-run motor vehicle accident that occurred on May 20,

2020, when an 18-wheeler with Defendant J.S. Helwig & Son, LLC's ("Helwig") name on it

crossed into Plaintiff Tina Heath's lane of travel, hit her 2006 Dodge Charger, forced it into

a guard rail, and continued driving without stopping. Plaintiff contends Defendant Jeffrey

Black was the driver of the 18-wheeler and negligently caused her injuries. Plaintiff also

contends Defendant Helwig is vicariously liable as Defendant Black's employer and directly

liable because they negligently hired, trained, retained, qualified, supervised, and entrusted

Black with the tractor trailer that caused the accident.

Currently before the Court are Defendant Black's Special Appearance Motions for

Summary Judgment; Defendant Helwig's Motion for Partial Summary Judgment; and

Plaintiff's Motions to Exclude Helwig's Experts Spero Karas, M.D. and Richard C. Baratta,

1

Ph.D. For the reasons explained herein, the Court **DENIES** Defendant Black's Special Appearance Motions for Summary Judgment [Docs. 42 & 47]; **GRANTS** Defendant Helwig's Motion for Partial Summary Judgment on Plaintiff's direct liability claims [Doc. 46]; **DENIES** Plaintiff's Motion to Exclude Helwig's Expert Spero G. Karas, M.D. [Doc. 45]; and **DENIES** Plaintiff's Motion to Exclude Helwig's Expert Richard C. Baratta, Ph.D [Doc. 44].

## BACKGROUND

At 6:03 a.m., on May 20, 2020, Plaintiff was traveling eastbound on the Oconee Connector towards Highway 316 in a 2006 Dodge Charger when she was struck by an 18-wheeler as it merged into her lane of travel that forced her vehicle into the highway's guardrail.[1] The driver of the tractor trailer truck did not stop and continued driving after the collision.[2] Plaintiff testified that the truck that hit her had the word "HELWIG" printed on the front side door of the tractor and also had "HELWIG" written on the side and back of the trailer.[3]

An unrelated truck driver driving behind Plaintiff on Highway 316 captured a video of the collision from his dash camera. The dash camera footage captured the events of the collision. It shows the 18-wheeler changing lanes from the center lane to the right lane of the highway.[4] As the 18-wheeler moved to the right, Plaintiff's brake lights came on, and the

---

[1] Pl. Depo., pp. 89, 110; Dash Cam Video footage.
[2] Pl. Depo., p. 101; Dash Cam Video footage.
[3] Pl. Depo., p. 101.
[4] Dash Cam Video footage.

Dodge began moving toward the right shoulder and guardrail.[5] The footage shows the back half of the trailer's right side contacting the left side of the Dodge, and then the right side of the Dodge hit the guardrail.[6] The dash camera included a speedometer readout which indicated he was travelling approximately 30 mph at the time of impact.[7] The trailer collided with Plaintiff's vehicle and then continued to drive away.[8] The video clearly shows "HELWIG" written on the back of the truck's trailer.[9]

Defendant Black denies that he is the driver involved in this accident, and Defendant Helwig contests it owned the tractor and trailer at the time of the accident. Defendant Helwig admits Defendant Black was its employee at the time of the accident and that the trailer had their name on it. But Helwig has been unable to definitively identify whether the tractor belonged to them, whether the trailer still belonged to them at the time of the accident, or whether it was being pulled by one of their drivers.[10]

Helwig can track where its drivers are located on the roadways using the Omnitracs log system and Smart Drive Camera, which gives the latitude and longitude of drivers within miles of the driver's location.[11] After receiving notification of the accident, Helwig performed an internal investigation into the trailer. Helwig conducted a proximity search

---

[5] *Id.*

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*.

[10] Helwig 30(b)(6) Depo. of David Lee Benson, pp. 62, 64 [Doc. 46-5]

[11] *Id.* at pp. 59-60.

using its Omnitracs log system and Smart Drive Camera and identified two of their drivers who would have been within miles of the area where the collision occurred.[12] Helwig driver of truck number 2506 was traveling approximately 2.6 miles from the location of the accident at 4:39 a.m., and driver of truck number 2494, Defendant Black, was traveling approximately 1.7 miles from the location of the accident at 6:01 a.m. The accident occurred at 6:03 a.m. Thus, Plaintiff named Black as the defendant driver in this case.

Helwig hired Black as a company driver in October 2019.[13] Helwig requires its drivers to be a minimum age; to have been driving on a Class-A CMV for at least one year in the past 3 years; and no driver can have more than three moving violations in a three-year period, no more than two moving violations in a 12-month period, and no Department of Transportation ("DOT") reportable accidents within a period of one year.[14]

Black underwent Helwig's hiring procedure before receiving his offer of employment which included completing Helwig's online application and signing disclosures for background checks from consumer reporting agencies, the Federal Motor Carrier Safety Administration, the DOT, and his criminal history.[15] On his application, Black disclosed his previous employment as a truck driver with eight other trucking companies since 2008. He reported one termination ten years before, in 2009, for a failed alcohol test.[16] The application

---

[12] *Id.* at p. 65.
[13] 30(b)(6) Depo., p. 54.
[14] *Id.* at p. 30.
[15] Black driver qualification file [Doc. 46-8]; 30(b)(6) Depo., pp. 39-40; 42.
[16] *Id.* at p. 15.

instructed him to disclose moving or traffic violations within the DOT's required previous three-year-period.[17] Black reported he had no violations within that time period, but he did include one speeding ticket for travelling nine miles over the speed limit in March 2016.[18] Black stated he had not been involved in any accidents within the past five years, had no criminal record, and no convictions for any alcohol, drug, or driving violations.

Helwig utilized third-party vendors to conduct independent investigations into Black's background in accordance with the DOT's three-year look-back period.[19] The investigations included following up with Black's previous employers for references and inquiring about any employment issues, pulling his Motor Vehicle Report, conducting criminal background checks, and obtaining a drug screening.[20] The reports Helwig received reflected no issues with drugs or alcohol; indeed, Black's previous employers stated Black had no issues with drugs or alcohol. Black's drug test was negative in all respects.

Black's Motor Vehicle Report showed one violation and subsequent license suspension in 2014 for failing to pay a traffic ticket in 2013.[21] His license was reinstated in 2015.[22] No other violation was reflected on his record. Thus, his record reflected no moving violations in the applicable three years before his date of hire; the only moving violation

---

[17] Helwig employment application [Doc. 46-8, pp. 16-17].
[18] *Id*.
[19] *See* 49 C.F.R. § 391.23.
[20] 30(b)(6) Depo., pp. 47-48; 49-50.
[21] Motor Vehicle Report [Doc. 46-8, pp. 125-127].
[22] *Id*.

reflected in his file was his self-reported speeding ticket in 2016. His record reflected no previous accidents.

Before hiring Black, Helwig required, as it does every prospective employee, to complete a road test, which exceeds the Department of Transportation's requirements.[23] Helwig also required its new hires, including Black, to complete over 10 training modules conducted by online training vendor Infiniti-I which Black had to pass or continue retaking until he passed before driving on the road.[24] Black passed the road test and completed each training module.

Black resigned from Helwig on September 3, 2020, to take a local job to be home more.[25]

## DISCUSSION

### I.    Motions for Summary Judgment

Defendant Black moves for summary judgment on two grounds: (1) the Court lacks personal jurisdiction over him because Plaintiff failed to properly serve him, and (2) no genuine issue of material fact exists to show he was the driver of the truck. Defendant Helwig moves for partial summary judgment on Plaintiff's direct liability claims for negligent hiring, retention, training, supervision, qualification, and entrustment.

### A. Standard

Summary judgment is proper if the movant "shows that there is no genuine dispute

---

[23] 30(b)(6) Depo., p. 52.
[24] *Id.* at p. 34; Black training certificates [Doc. 46-7].
[25] Doc. 46-8, p. 93.

as to any material fact and the movant is entitled to judgment as a matter of law."[26]  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[27]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[28]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[29]  "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[30]  In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts."[31]  A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[32]  "The court may not resolve any material

---

[26] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[27] *Catrett*, 477 U.S. at 323 (internal quotation marks omitted).

[28] *See* Fed. R. Civ. P. 56(e); *see also Catrett*, 477 U.S. at 324-26.

[29] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[30] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

[31] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[32] *Id*. (internal quotation marks omitted).

factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[33]

## B.  Defendant Black's Special Appearance Motion for Summary Judgment

Defendant Black first argues he is entitled to judgment as a matter of law because Plaintiff failed to properly serve him with process. The Court disagrees.

### 1.  Background

Plaintiff filed her First Amended Complaint for Damages on March 3, 2022, naming Defendant Black as a defendant in this case. Plaintiff served Black with process via substituted service on March 17, 2022. On March 21, 2022, process server Marcus Lawing executed a notarized affidavit of service indicating that he served a woman named "Dorothy a/k/a Dot" at 422 Alexander Street, Mooresville, North Carolina.[34] Mr. Lawing further attested that Dorothy confirmed both she and Defendant Black resided at the Alexander Street address. Plaintiff filed the Affidavit of Service with the Court on March 22, 2022.[35]

On May 19, 2022, Defendant Black filed a Special Appearance Motion to Quash Service of Discovery Documents arguing he had never been served and therefore was not subject to the jurisdiction of the Court. The Court found Defendant Black failed to offer any persuasive evidence indicating the service was defective, denied the motion, and ordered him to respond to discovery.

---

[33] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.
[34] Affidavit of Service [Doc. 48-2, p. 2].
[35] *Id.*

### 2.  Analysis

Defendant Black now seeks summary judgment essentially restating the same arguments he asserted in his Motion to Quash. He states he does not reside at the Alexander Street address; the Alexander address is not his "dwelling house or usual place of abode"; and he does not reside with Dorothy a/k/a Dot.[36] But Black's conclusory statements fail to show service was defective.

Under Fed. R. Civ. P. 4(e), an individual may be served by following state law for service or by:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

(C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Georgia's law regarding personal service mirrors that of the federal rules:

Service shall be made by delivering a copy of the summons attached to a copy of the complaint as follows … to the defendant personally, or by leaving copies thereof at the defendant's dwelling house or usual place of abode with some person of suitable age and discretion then residing therein, or by delivering a copy of the summons and complaint to an agent authorized by appointment or by law to receive service of process.[37]

A plaintiff is ultimately responsible for timely serving process on the defendant. [38]

The Eleventh Circuit has held that "service of process that is not in 'substantial compliance' with the requirements of the Federal Rules is ineffective to confer personal jurisdiction over

---

[36] Black Decl., p. 2 [Doc. 42-3]; Black Depo., pp. 17-19 [Doc. 62-1].

[37] O.C.G.A. § 9-11-4(e)(7).

[38] *Anderson v. Osh Kosh B'Gosh*, 255 F. App'x 345, 347 (11th Cir. 2006).

the defendant, even when a defendant has actual notice of the filing of the suit."[39]

As a general rule, a return of service that is filed with the Court pursuant to the Federal Rules of Civil Procedure establishes "the *prima facie* validity and timeliness of service."[40] Once a plaintiff has made this threshold showing, a defendant must show invalidity of service by clear and convincing evidence.[41] Where there is a conflict between the evidence, "the court must construe all reasonable inferences in favor of the plaintiff."[42]

Black fails to show invalidity of service by clear and convincing evidence. In asserting that he was not properly served, Defendant Black averred and testified that he was not served, he did not live with Dorothy at the Alexander Street address, and, as a long-haul truck driver, he was living in hotel rooms and in his truck for an unknown period of time.[43] But this evidence fails to satisfy the clear and convincing evidence needed to rebut Plaintiff's affidavit of service. Black also testified that Dorothy was his sister; she told him about her receipt of the documents at the Alexander Street address; his driver's license, issued on August 23, 2021, indicated that he, in fact, resided at the Alexander Street address; and he received his mail at the Alexander Street address.[44] Thus, Defendant Black was served at the address on his driver's license and where he received his mail; the woman who accepted service was his sister; and Black gave no other address where he resided. Resolving the evidentiary conflicts in Plaintiff's favor, Defendant Black has not met his burden. Thus, his

---

[39] *Abele v. City of Brooksville, Fla.*, 273 F. App'x 809, 811 (11th Cir. 2008) (citing *Prewitt Enters. v. Org. of Petroleum Exp. Countries*, 353 F.3d 916, 925 (11th Cir. 2003)).

[40] *Udoinion v. The Guardian Security*, 440 F. App'x 731, 735 (11th Cir. 2011).

[41] *Kammona v. Onteco Corp.*, 587 F. App'x 575, 578 (11th Cir. 2014).

[42] *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).

[43] Black Decl., p. 2; Black Depo., p. 17.

[44] Black Depo., pp. 17-19.

Motion for Summary Judgment based on insufficient service of process is **DENIED.**

1. **Defendant Black's Motion for Summary Judgment on Liability**

Defendant Black next argues he is entitled to summary judgment because no genuine issue of material fact exists to show he was the driver of the 18-wheeler involved in this case. Again, the Court disagrees. The record contains evidence from which a reasonable jury could find Defendant Black was the driver of the 18-wheeler involved in this accident.

Under Georgia law, "'the mere presence of lettering or a logo on the side of a vehicle, <u>without more</u>, is insufficient to establish liability'" because "[i]t is too great an inferential leap to presume ownership or agency based merely on the visual observation of a company's name or distinctive insignia on a vehicle."[45] "A plaintiff 'must point to specific evidence giving rise to a triable issue on whether the company owned the vehicle that caused the accident and whether the driver of the vehicle was an employee or agent of the company and was driving the vehicle in the course and scope of his employment."[46]

This case involves more than merely the visual observation of Helwig's name on the truck, and a reasonably jury could infer that Defendant Black, indisputably Helwig's employee at the time of the accident, drove the truck that caused the accident. First, a genuine issue of material fact exists whether the 18-wheeler that hit Plaintiff's vehicle was owned by Helwig. Plaintiff testified that the truck that hit her had the word "HELWIG" printed on the front side door of the tractor and on the side and back of the trailer.[47] The

---

[45] *Pearson v. Doe*, 2022 WL 7952610, at *2 (11th Cir. Oct. 14, 2022) (quoting *Biddy v. City of Cartersville*, 638 S.E.2d 874, 876 (Ga. Ct. App. 2006) and citing *Sellers v. Air Therm Co.*, 498 S.E.2d 167, 168 (Ga. Ct. App. 1998)) (emphasis added).
[46] *Id.* (quoting *Sellers*, 498 S.E.2d at 169).
[47] Pl. Depo., p. 101.

dash cam video of the accident also clearly shows "HELWIG" printed on the trailer. Although Helwig could not confirm that it owned the truck or the trailer, Helwig's corporate representative stated that no one else hauls trailers for Helwig other than Helwig drivers.[48]

Second, a genuine issue of material fact exists whether Defendant Black was the driver of the tractor trailer that hit Plaintiff. Helwig performed a proximity search using its Omnitracs log system and SmartDrive camera system that gives a longitude and latitude location within miles of each its drivers.[49] The proximity report showed that the truck Defendant Black was driving on the date and time of the accident was travelling approximately 1.7 miles from the location of the accident within two minutes of the time the accident occurred. Thus, a reasonable jury could find Defendant Black was the driver of the 18-wheeler involved in this accident, and Black's Motion for Summary Judgment is **DENIED**.

## 2. Defendant Helwig's Motion for Partial Summary Judgment

Because genuine issues of material fact exist as to whether Helwig owned the 18-wheeler and whether Defendant Black was the driver, Plaintiff's vicarious liability claims against Defendant Helwig as Black's employer at the time will proceed. Helwig, however, is entitled to summary judgment on Plaintiff's claims for negligent hiring, retention, training, supervision, and entrustment.

### a. Negligent Training

Plaintiff failed to respond to or otherwise address Helwig's arguments in favor of summary judgment on her claim for negligent training. "In opposing a motion for summary

---

[48] 30(b)(6) Depo., p. 62.
[49] *Id.* at pp. 59-60

judgment, a party may not rely on his pleadings to avoid judgment against him."[50] "[T]he onus is on the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."[51] Because Plaintiff has abandoned her negligent training claim, Helwig is entitled to summary judgment.[52]

But even if Plaintiff had not abandoned this claim, it would fail as a matter of law on the merits. To establish a negligent training claim under Georgia law, "a plaintiff must demonstrate that inadequate training caused a reasonably foreseeable injury,"[53] and to defeat summary judgment, "a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue."[54] The record contains no evidence Helwig inadequately trained Black or that any such inadequate training caused Plaintiff's injury.

### b. Negligent Hiring, Retention, Supervision, and Entrustment

Under Georgia law, an employer "has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's tendencies or propensities that the employee could cause the type of harm sustained by the plaintiff."[55] "The appropriate

---

[50] *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citation and internal quotation marks omitted).

[51] *Id.* (citation omitted); *see also Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("Failure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

[52] *See Clark v. City of Atlanta*, 544 F. App'x 848, 855 (11th Cir. 2013) (holding that district court "properly treated as abandoned [the plaintiffs' claims], which were alleged in the complaint but not addressed in opposition to the motion for summary judgment.").

[53] *Id.*

[54] *Edwards v. Comtrak Logistics, Inc.*, 2014 WL 11820247 (N.D. Ga. Mar. 5, 2014).

[55] *Munroe v. Universal Health Servs., Inc.*, 596 S.E.2d 604, 606 (Ga. 2004) (citation and punctuation omitted).

standard of care in a negligent hiring/retention action is whether the employer knew or should have known the employee was not suited for the particular employment."[56] "The suitability question is properly determined in reference to the particular job involved."[57] To avoid summary judgment on a negligent hiring claim, "a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue."[58] To avoid summary judgment on a negligent retention claim, a plaintiff must present evidence that the employer retained the employee "despite either actual or constructive knowledge that he posed a reasonably foreseeable risk of causing the type of harm suffered."[59]

To establish a negligent supervision claim, a plaintiff must "establish that the employer reasonably knew or should have known of an employee's tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff."[60] Finally, a claim of negligent entrustment of a vehicle cannot succeed against an employer without showing "actual knowledge that the driver is incompetent or habitually reckless."[61]

Plaintiff argues questions of fact exist as to whether Helwig is liable for negligent hiring, retention, supervision, and entrustment because Helwig knew Black's commercial driver's license ("CDL" had been suspended and disqualified in June 2019, just four months

---

[56] *Patterson v. Southeastern Newspapers, Inc.*, 243 Ga. App. 241, 245 (2000) (internal quotation marks and citation omitted).

[57] *CSX Transp., Inc. v. Pyramid Stone Indus., Inc.*, 293 F. App'x 754, 756 (11th Cir. 2008) (citation omitted).

[58] *Remediation Res., Inc. v. Balding*, 635 S.E.2d 332, 335 (Ga. Ct. App. 2006) (citation omitted).

[59] *Advanced Disposal Servs., Atlanta v. Marczak, LLC*, 359 Ga. App. 316, 319 (2021).

[60] *Leo v. Waffle House, Inc.*, 298 Ga. App. 838, 840 (2009) (quoting *Alexander v. A. Atlanta Autosave*, 272 Ga. App. 73, 77 (2005)).

[61] *Western Industries v. Poole*, 280 Ga. App. 378, 380 (2006) (internal quotation marks and citation omitted); *see also Hicks v. Heard*, 297 Ga. App. 689, 691 (2009) (holding that evidence of a speeding ticket and minor accident in two years before the accident was insufficient to establish the employee was an incompetent driver or habitually reckless).

before he was hired; Helwig did nothing to investigate the suspension and disqualification and should have discovered the underlying facts before it hired, retained, supervised, and entrusted Black with its vehicles. But Black's alleged June 2019 suspension and disqualification is not substantiated in the record; even if Black did, in fact, have such an infraction, no evidence reflects Helwig had any knowledge of the it until this litigation; and even if Helwig had investigated the suspension and disqualification, no evidence shows they would have found any cautionary information.

During Helwig's corporate representative's deposition, Plaintiff's counsel asked him about Black's "background check" and referenced a suspension and disqualification of his commercial driver's license in June 2019.[62] The representative acknowledged that the document showed a "failure to comply with out-of-state citation,"[63] and he acknowledged that it also showed a "CDL Disqualification GS20-17.4L" from North Carolina.[64] Over defense counsel's objection, Plaintiff's attorney then referenced North Carolina's "disqualification statute for a CDL" and stated that "according the statute, that's a disqualification for testing positive on a drug or alcohol test" for which the "minimum time [a CDL] would be suspended would be for 30 days."[65] Plaintiff argues "[h]ad Helwig investigated the suspension and disqualification, it could have found similar issues with Black, such as a real issue with alcohol or drugs, which would cause him to leave the scene

---

[62] 30(b)(6) Depo., pp. 42, 44-45
[63] *Id*. at p. 42.
[64] *Id*. at pp. 44-45.
[65] *Id*. at 45-46.

of an accident rather than undergoing a test, or leaving the scene of a collision possibly leading to a suspension of a CDL."[66]

But the document referenced in Helwig's deposition is not in the record. Moreover, there is no indication the "background check" Plaintiff's attorney references was ever submitted to Helwig. On the contrary, the evidence shows that the background check Helwig received on Black did <u>not</u> contain any license suspension or disqualification in June 2019. Black's Motor Vehicle Report showed one violation and subsequent license suspension in 2014 for failing to pay a traffic ticket in 2013, and his license was reinstated in 2015.[67] No evidence establishes Helwig had any knowledge of such suspension or disqualification when Black was hired, during Black's employment, or through the time of the accident in this case. The record contains no evidence these violations occurred, why Helwig should have known about these violations, or that Helwig was "required to carry out a more extensive vetting process when they hired [retained, supervised, and entrusted] him, or that they would have found any cautionary information had they done so."[68] "Mere speculation is not enough to rebut contrary evidence, and for an inference to create a genuine issue of material fact that is enough to defeat a motion for summary judgment, the inference must be based upon evidence 'which is [not] too uncertain or speculative or which raises merely a conjecture or possibility.'"[69]

---

[66] Pl. Response Brief, p. 12.

[67] Motor Vehicle Report [Doc. 46-8, pp. 125-127].

[68] *Cleveland v. Team RTR2, LLC*, 359 Ga. App. 104, 109 (2021) (holding a trail court did not err in granting summary judgment to an employer defendant on negligent hiring where it conducted a background check and required a practical evaluation but did not discovery any evidence of a criminal propensity in the employee).

[69] *Parker v. Wal-Mart Stores East, L.P.*, Case No. 1:16-CV-1479-ODE, 2018 WL 9437354, *4 (N.D. Ga. August 22, 2018).

The evidence shows that when Helwig hired Black, Helwig abided by its hiring policies that` exceeded the Department of Transportation's requirements. Helwig obtained an application from Black and used third-party vendors to conduct investigations into Black's driving history, employment history, and criminal history in accordance with the Department of Transportation's three-year look-back period. As part of this investigation, the third-party vendors reached out to employers and obtained references and sent him for a drug screening. Helwig also required Black to successfully complete a road test and numerous training modules before driving for Helwig.

The infractions from Black's application and record revealed a speeding ticket he received for travelling nine miles over the speed limit in March 2016, more than three years before his employment with Helwig; a license suspension and disqualification in 2014 (reinstated in 2015) for failure to answer an out-of-state citation relating back to an unpaid traffic ticket from 2013; and a termination from employment in 2009 for a failed alcohol test. None of these infractions occurred within the three-year look-back period, and only one was a moving violation. Indeed, Helwig's investigation of Black showed only one incident involving alcohol a decade before his date of hire, and it included numerous references indicating Black had no instances involving alcohol. All of Black's previous employers' references obtained in Black's hiring process confirmed he had no drug or alcohol issues. Moreover, Black's Medical Examination Report Form from when he was hired by Helwig stated he did not currently drink alcohol, had not used drugs within the past two years, and had never failed a drug test.

In sum, Plaintiff fails to provide any evidence that Helwig knew or should have known Black was "not suited" to drive its trucks.[70] The investigation into Black's motor vehicle record, employment history, and criminal background failed to show any previous hit and run or other motor vehicle incidents similar to the behavior that was the cause of the injury at issue[71]; that Helwig reasonably knew or should have known of Black's "tendencies to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff"[72]; or that Helwig had any "actual knowledge that [Black] [wa]s incompetent or habitually reckless."[73] Thus, Helwig cannot be held independently liable for negligently hiring, retaining, supervising, or entrusting Black to drive its trucks and is entitled to summary judgment on these claims.

## II.    Plaintiff's Motions to Exclude Experts

In support of its defense, Defendant Helwig offers the opinions Spero G. Karas, M.D., and Richard C. Baratta, Ph.D. Plaintiff argues all of the experts' opinions are inadmissible. The Court disagrees.

### A. Motion to Exclude Spero Karas, M.D. as Untimely

Plaintiff seeks to exclude Helwig's expert Dr. Spero G. Karas's testimony as untimely

---

[70] *Patterson v. Southeastern Newspapers, Inc.*, 243 Ga. App. 241, 245 (2000) (internal quotation marks and citation omitted).

[71] *Remediation Res., Inc. v. Balding*, 635 S.E.2d 332, 335 (Ga. Ct. App. 2006) (citation omitted) (To avoid summary judgment on a negligent hiring claim, "a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue.").

[72] *Leo v. Waffle House, Inc.*, 298 Ga. App. 838, 840 (2009) (quoting *Alexander v. A. Atlanta Autosave*, 272 Ga. App. 73, 77 (2005)).

[73] *Western Industries v. Poole*, 280 Ga. App. 378, 380 (2006) (internal quotation marks and citation omitted); *see also Hicks v. Heard*, 297 Ga. App. 689, 691 (2009) (holding that evidence of a speeding ticket and minor accident in two years before the accident was insufficient to establish the employee was an incompetent driver or habitually reckless).

because Helwig failed to disclose him as an expert within the period designated under the Court's Scheduling Order. But the Court finds Helwig's late disclosure of Dr. Karas was substantially justified and harmless.

### 1. Background

Defendants timely removed this action to federal court on October 20, 2021.[74] The Court entered the Original Scheduling and Discovery Order on January 5, 2022, which set deadlines for Defendants to disclose their expert witnesses by March 24, 2022, and the parties complete discovery by May 23, 2022, and file dispositive and *Daubert* motions by June 22, 2022.[75] Thereafter, the Court granted the parties' three consent motions to extend all deadlines in the Scheduling and Discovery Order, which set finaldeadlines for Defendants to disclose experts by January 20, 2023, the parties complete discovery by March 20, 2023, and they file dispositive and *Daubert* motions by April 20, 2023.[76]

On February 21, 2023, just over a month after Defendants' time to disclose experts had expired, Plaintiff served Defendants her Sixth Supplemental Rule 26 Disclosures, attaching for the first time a medical narrative from her treating physician, Dr. Hodari Brooks, dated January 17, 2023. In the narrative, Dr. Brooks stated a causation opinion relating to Plaintiff's left knee injury and need for surgery due to the accident. Thus, Helwig investigated medical experts to opine on causation; identified and retained Dr. Karas; had Dr. Karas review the case materials and provide a narrative opinion; and then disclosed Dr. Karas on March 20, 2023, the same date discovery expired, two months after the expert

---

[74] Notice of Removal [Doc. 1].
[75] Scheduling and Discovery Order [Doc. 10].
[76] Order [Doc. 37].

disclosure deadline had expired, but a month before dispositive or *Daubert* motions were due on April 20, 2023.

### 2. Analysis

Fed. R. Civ. P. 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witnesses it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." These disclosures must be made "at the times and in the sequence that the court orders."[77] Compliance is necessary to allow "both sides in a case to prepare their cases adequately and to prevent surprise."[78] A party who fails to comply with Rule 26 may be prohibited from using the identified witness at trial "unless the failure was substantially justified or is harmless."[79] "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the non-disclosing party."[80]

"Courts enjoy broad discretion under Rule 37(c)(1) to exclude evidence."[81] In exercising that discretion, courts generally consider the following four factors: "(1) the importance of the excluded testimony; (2) the explanation of the party for its failure to comply with the required disclosure; (3) the potential prejudice that would arise from allowing the testimony; and (4) the availability of a continuance to cure such prejudice."[82] Considering those factors, the Court will not exclude Dr. Karas.

Plaintiff argues Defendants knew Dr. Karas would opine that the accident in this case

---

[77] Fed. R. Civ. P. (a)(2)(C).

[78] *Cooper v. Southern Co.*, 390 F.3d 695, 728 (11th Cir. 2004) (internal citation omitted) *overruled in part on other grounds*, *Ash v. Tyson Foods, Inc.*, 546 U.S. 454 (2006).

[79] Fed. R. Civ. P. 37(c)(1).

[80] *Mitchell v. Ford Motor Co.*, 318 F. App'x 821, 824 (11th Cir. 2009) (citation omitted).

[81] *Guevara v. NCL (Bahamas) Ltd.*, 920 F.3d 710, 718 (11th Cir. 2019).

[82] *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, Case No. 3:19-MD-2885, 2021 WL 763778, at *2 (N.D. Fla. Jan. 15, 2021) (citations omitted).

was the proximate cause of the injuries to her left knee in February 2022, when Plaintiff gave them her Second Supplemental Rule 26 Initial Disclosures, and thus, the late disclosure of Dr. Kara is not justified. But the fact remains that Plaintiff did not disclose Dr. Brooks's causation opinion relating to Plaintiff's left knee injury and need for surgery until February 21, 2023, over a month after Defendants' time to disclose experts had expired. As stated above, upon receiving the opinion, Helwig investigated medical experts to opine on causation; identified and retained Dr. Karas; had Dr. Karas review the case materials and provide a narrative opinion; and then disclosed Dr. Karas on March 20, 2023, the same date discovery expired, but before dispositive or *Daubert* motions were due on April 20, 2023.

The Court finds Helwig's late disclosure substantially justified and harmless. Plaintiff has not been prejudiced: Helwig has not prevented Plaintiff from conducting Dr. Karas' deposition outside discovery, as the parties have continued to take depositions in this case despite the dispositive and *Daubert* motions deadlines having expired. Moreover, Plaintiff had 30 days following Helwig's disclosure of Dr. Karas to disclose a rebuttal expert.[83] Thus, Plaintiff's Motion is **DENIED.**

**B. Motion to Exclude Testimony of Richard Baratta, Ph.D**

Plaintiff seeks to exclude the opinions of Helwig's expert Richard C. Baratta, Ph.D., an accident reconstructionist and biomechanical engineer, who offers opinions about the forces involved in the accident, how those forces would have affected the occupant of the car, and whether Plaintiff's claimed injuries are consistent with the type and direction of the

---

[83] *See Reese v. CSX Transportation, Inc.*, 2020 SL 5740253, *15 (S.D. Ga. 2020) (when a scheduling order is silent as to rebuttal witnesses, Fed. R. Civ. P. 26(a)(2)(D)(ii) applies to rebuttal witnesses which provides that rebuttal experts may be disclosed within 30 days of disclosure of the expert).

forces applied by the accident. Plaintiff argues Dr. Baratta's entire testimony must be excluded as unqualified, unreliable, and unhelpful to the trier of fact under Fed. R. Evid. 702 and *Daubert* and its progeny. The Court disagrees.

As explained below, Baratta is qualified to testify as to the amount of force he believes was generated by the collision and the effects such force would have on an occupant in a comparable accident; his opinions are based on a reliable methodology properly applied to the facts of this case; and his testimony will be helpful to the jury.

1. **Legal Standard**

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[84]

Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of

---

[84] Fed. R. Evid. 702.

scientific, technical, or specialized expertise, to understand the evidence or determine a fact in issue.[85]

As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*,[86] Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative and unreliable opinions do not reach the jury.[87] Acting as a gatekeeper, the trial court must make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[88] The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."[89]

To fulfill its role, the trial court must determine whether the expert has the requisite qualifications to offer his or her opinions.[90] The trial court must also "'conduct an exacting analysis' of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702."[91] Finally, the court must ensure the relevancy of expert testimony, meaning that it must determine whether the testimony will assist the trier of

---

[85] *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1257 (11th Cir. 2002) (quoting *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)); *J & V Dev., Inc. v. Athens-Clarke County*, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).
[86] 509 U.S. 579 (1993).
[87] *Id.* at 589 n.7; *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005).
[88] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); see also *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003).
[89] *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (quoting *Daubert*, 509 U.S. at 595) (internal quotations omitted).
[90] *Poulis-Minott v. Smith*, 388 F.3d 354, 359 (1st Cir. 2004); *see also Frazier*, 387 F.3d at 1260.
[91] *Frazier*, 387 F.3d at 1260 (quoting *McCorvey*, 298 F.3d at 1257).

fact.[92] In undertaking this analysis, the court must remember that the party offering the expert opinions has the burden of proof by a preponderance of the evidence.[93]

The court performs its gatekeeping role consistent with Rule 104(a), which commits preliminary evidentiary questions to the court's decision and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[94] In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."[95] Although *Daubert* involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and *Daubert* apply with equal force to non-scientific expert witnesses.[96] Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and *Daubert*.[97] Finally, "any step that renders the analysis unreliable renders the expert's testimony inadmissible."[98]

---

[92] *See Daubert*, 509 U.S. at 591.

[93] *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1238 (11th Cir. 2005).

[94] *Daubert*, 509 U.S. at 592–93 & n.10; Fed. R. Evid. 104(a). In particular, Rule 104(a) provides that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Fed. R. Evid. 104(a).

[95] *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

[96] *See Kumho Tire*, 526 U.S. at 147.

[97] *McClain*, 401 F.3d at 1238 & n.2; *see Frazier*, 387 F.3d at 1260.

[98] *Goebel*, 346 F.3d at 992 (quoting *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted); *see also McClain*, 401 F.3d at 1245 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2002)).

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."[99] Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter.[100] Indeed, "experts come in various shapes and sizes," and, consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field."[101] In all cases, the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce.[102]

Regarding, the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology can be applied to the facts in issue."[103] This inquiry must focus "solely on [the] principles and methodology [of the experts], not on the conclusions that they generate."[104]

*Daubert* offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and

---

[99] *Frazier*, 387 F.3d at 1260.

[100] *Id.* at 1260–61.

[101] *Santos v. Posadas de Puerto Rico Assocs. Inc.*, 452 F.3d 59, 63 (1st Cir. 2006).

[102] *Poulis-Minott*, 388 F.3d at 359.

[103] *Frazier*, 387 F.3d at 1262 (quoting *Daubert*, 509 U.S. at 592–92) (internal alterations omitted).

[104] *Daubert*, 509 U.S. at 595; *see also Goebel*, 346 F.3d at 992.

publication; and (4) general acceptance.[105] These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts.[106] Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court. The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology.[107]

The advisory committee's notes for Rule 702 offer an additional list of factors or tests. These tests are:

(1)    Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

(2)    Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)    Whether the expert has adequately accounted for obvious alternative explanations;

(4)    Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;

(5)    Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.[108]

Like the four *Daubert* factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory

---

[105] 509 U.S. at 593–94; *see also Goebel*, 346 F.3d at 992.

[106] *See Kumho Tire*, 526 U.S. at 150–52.

[107] *Id*. at 151–52.

[108] Fed. R. Evid. 702 advisory committee's notes to 2000 amendments.

committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.[109]

Finally, for admission, the expert testimony must assist the trier of fact. Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."[110] "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."[111] Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.[112] Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."[113] "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[114] Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it has relevant 'fit.'"[115]

At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as gatekeeper and the jury's role as the ultimate fact-finder. A district court's "gatekeeping role . . . is not intended to supplant the adversary system or the role of the jury."[116] "[O]nce the court has found it

---

[109] *See id.*

[110] *Frazier*, 387 F.3d at 1262.

[111] *Id.* at 1262–63.

[112] *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

[113] *Id.; see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

[114] *Joiner*, 522 U.S. at 146.

[115] *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1121 (10th Cir. 2004).

[116] *Allison*, 184 F.3d at 1311.

more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."[117] "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[118] A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies;"[119] instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."[120] But the court must ensure "each expert opinion . . . stay[s] within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."[121]

### 1.   Baratta's Opinions

Dr. Baratta performed accident reconstruction and biomechanical analyses of the accident in this case and opines it was a low-impact accident where the 18-wheeler sideswiped Plaintiff's Dodge Charger; as a result of the forces generated in the accident, Plaintiff's car would have undergone minor shaking on its suspension, and Plaintiff would have been exposed to "minor swaying and vibratory motions with accelerations and internal loads well within the levels would be experienced on a routine basis."[122] He makes nine specific conclusions in his Expert Report:

1.   The nature of this accident was akin to a sideswipe in which the Helwig trailer made

---

[117] Fed. R. Evid. 702 advisory committee's notes to 2023 amendments.

[118] *Daubert*, 509 U.S. at 596.

[119] *Quiet Tech. DC-8, Inc., v. Hirel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

[120] *Frazier*, 387 F.3d at 1272.

[121] Fed. R. Evid. 702 advisory committee's notes to 2023 amendments.

[122] Baratta's Expert Report, p. 24 [Doc. 49-2].

sliding contact with the right side of [Plaintiff's] Dodge [vehicle] while snagging multiple outer panels of the Dodge. There was also a lateral rightward-directed pushing component to the Dodge's motion due to the prolonged contact with the Helwig trailer of approximately 3 miles per hour (mph). In this type of accident, the Dodge would have been exposed to rocking and shaking on its suspension along with potential frictional slowing. Due to the contact with the guardrail, the right side of the Dodge moved vertically upward before returning to the roadway; however, the left side of the vehicle experienced a lesser degree of vertical motion.

2.  The driver of the Dodge would have been exposed to lateral swaying, vibrational motions, and forward motion within the vehicle, well within levels experienced during routine activities of daily living and well inside levels considered safe.

3.  Transient cervical strains and associated headaches would be consistent with the dynamics, or movements of the Dodge in the subject accident. However, lumbar strains or sprains to spinal tissues would not be consistent with being caused by the mechanics of this accident.

4.  The mechanism for acute intervertebral disc herniations, in the absence of bony fractures or ligament tears, is combined with hyperflexion and forced compression. There would have been no mechanism for these motions for a properly restrained occupant of the Dodge due to contact with the Helwig trailer. There, the mechanics of acute disc herniations would not be consistent with the dynamics of this accident.

5.  The mechanisms associated with structural aggravation of existing degeneration would not be consistent with being present with the dynamics of this accident.

6.  Peer-reviewed medical and biomechanical literature indicates that the mechanism for a meniscal tear is a combination of compressive and torsional loading of the knee, typically in flexion, resulting in shear forces on the meniscus. These mechanisms were not present from the vibratory motion experienced during this accident.

7.  [Plaintiff] indicated in her claims that she sustained an injury to her right shoulder; however, there were no diagnoses corresponding the complaints she expressed. If specific medical diagnoses are provided addressing these complaints, then the biomechanics of each specifically stated injury could be addressed.

8.  [Plaintiff] also reported injuries to her "assbone," but it was not clear whether this injury was to her ischial tuberosities or coccyx. The Dodge did experience an element of vertical motion during the collision, so there may have been some minor loading

to the soft tissues of the gluteus and soft tissues inferior to the coccyx, but there was no evidence of physical injury to this area nor were there specific medical diagnoses within this region available for evaluation.

9. The biomechanical analysis was based on the medical records provided.[123]

### a. Qualifications

Plaintiff does not appear to argue Baratta is unqualified to testify as an expert biomechanical engineer and accident reconstructionist. Nor could Plaintiff seriously contend that Baratta is unqualified to do so.

Dr. Baratta holds multiple degrees in biomedical engineering from Tulane University including a Ph.D., M.S., and B.S.E. [124] He is a biomechanical engineer with extensive experience in biomechanical analysis and accident reconstruction.[125] Since receiving his Ph.D. in 1989, he has worked for Tulane School of Engineering, Louisiana State University (LSU) School of Medicine, and Rimkus Consulting Group, Inc.[126] Dr. Baratta is also a certified accident reconstructionist, certified crash data retrieval technician and analyst, and a registered professional engineer.[127] He has extensive experience in both fields and has been the author or co-author of 100 scientific journal articles and over 150 additional publications. He has been qualified as an expert in biomechanics and accident reconstruction in numerous trials throughout the country.[128] Dr. Baratta is qualified to testify as an expert in biomechanics and accident reconstruction.

---

[123] *Id.* at pp. 2-3.
[124] Baratta Curriculum Vitae, p. 3 [Doc. 49-1].
[125] *Id.*
[126] *Id.* at pp. 2-3.
[127] *Id.*
[128] Baratta Depo., pp. 63-123 [Doc. 49-3].

Plaintiff argues Dr. Baratta is not qualified to testify as to the medical causation of Plaintiff's injuries. The Court agrees Dr. Baratta is not qualified to render an opinion as to the specific causation of Plaintiff's injuries. Indeed, Dr. Baratta agrees as a biomechanical engineer he is not qualified to provide medical causation opinion: He is not a medical doctor, he does not have a medical degree, and he does not hold himself out as a medical expert.[129]

As this Court and many other federal courts have recognized, "biomechanical engineers typically are found to be qualified to render an opinion as to the forces generated in a particular accident and the general types of injuries those forces may generate," but they are "ordinarily not permitted to give opinions about the precise cause of a specific injury."[130] Similarly, federal courts have held that biomechanical engineers may testify whether the forces generated by accidents are likely to generate the <u>types</u> of injuries alleged by the plaintiff, but they may not offer opinions about the precise cause of a specific injury.[131]

Dr. Baratta's expertise is limited to the biomechanical engineering field, and therefore he is qualified to testify about matters relating to biomechanics and accident reconstruction, including the forces the accident in this case would generate, the damage to the vehicle, and the probable hypothetical effects of such forces on the human body, i.e., whether this accident was likely to generate the <u>types</u> of injuries alleged by Plaintiff. Dr. Baratta's

---

[129] *Id.* at p. 70.

[130] *Bowers v. Norfolk So. Corp.*, 537 F. Supp. 2d 1343 (M.D. Ga. 2007) (internal quotation marks and citation omitted.); *see also Herrera v. Werner Enters., Inc.*, 2015 WL 12670443, at *3 (S.D. Tex. Sept. 28, 2015) ("Biomechanical and mechanical engineers are qualified to testify about the forces generated by accidents and the probable effects of such forces on the human body, but not about whether the particular accident at issue is the cause of plaintiff's injuries.") (collecting cases); *Ramirez v. Escajeda*, 2021 WL 1131721, at *10 (W.D. Tex. March 24, 2021) (collecting cases).

[131] *See e.g., Vazquez v. Aguilera*, 2022 WL 2292888, *5 (S.D. Tex. March 25, 2022) (collecting cases).

opinions in this case are precisely that. They concern the biomechanical forces involved in this accident, the damage to Plaintiff's vehicle, and the effect those forces would have on an occupant's body involved in a comparable accident. Dr. Baratta may not opine as to whether this accident in fact caused Plaintiff's injuries.

### b. Reliability

Dr. Baratta's opinions are based on valid facts, data, and methodology properly applied to the facts of this case. Plaintiff's arguments to the contrary go to the weight of Baratta's opinions, not their admissibility, and may be properly explored on cross examination.

In preparing his report and developing his opinions, Dr. Baratta reviewed the dash camera video footage of the accident, photos of the damage to Plaintiff's Dodge Charger, photographs of an exemplar 2006 Dodge Charger, AutoStats dimensional data of a 2006 Dodge Charge, the Georgia Uniform Motor Vehicle Accident Report, and Google Earth and Google Street View images of the area where the accident occurred.[132] Dr. Baratta consulted 40 peer-reviewed studies of lane change maneuvers and sideswipes performed under controlled conditions; reviewed results obtained after standardized crash tests; and reviewed a number of exemplar vehicles from the National Automotive Sampling System-Crashworthiness Data System (NASS-CDS) to compare damage sustained by Plaintiff's Dodge to damage sustained by exemplar vehicles in similar accidents and in which the associated change in speed was known or could be determined.[133] He performed a comparative damage analysis to assess the severity of the accident; a kinematic analysis to

---

[132] Baratta Expert Report [Doc. 44-3].
[133] *Id.*

determine vehicle to vehicle interaction; and a series of mathematical simulations of the circumstances of the accident to assess the accident's dynamics.[134] He also reviewed Plaintiff's medical records.

Plaintiff first argues Dr. Baratta's opinions are unreliable because he did not visit the scene of the accident; did not see any photos of the tractor trailer; did not physically inspect either vehicle; did not consider a download of data from Plaintiff's vehicle or the truck; and did not have any conversations with Plaintiff or the truck driver. In other words, Plaintiff contends Dr. Baratta's opinions lack a reliable foundation because he did not conduct any first-hand investigations. But an expert is not required to base his opinions on first-hand knowledge. Dr. Baratta's review of the accident captured on video and photographs of the damage to Plaintiff's vehicle sufficiently allowed him to draw his conclusions. Moreover, Dr. Baratta testified that data downloads would not have been helpful: Plaintiff's vehicle was designed only to save data in the event of airbag deployment, which did not occur, and the tractor-trailer did not have a braking event.[135] And a physical inspection of Plaintiff's vehicle was not possible as it was sold for salvage following the collision.[136] Expert witnesses are allowed "wide latitude" in choosing what data they rely on in forming their opinions, "including those that are not based on first-hand knowledge or observation."[137]

Plaintiff next argues Dr. Baratta's opinions lack a proper foundation because the vehicles he examined from the NASS database and the peer-reviewed studies he consulted did not mirror the specific circumstances and facts in this case. Plaintiff points out that Dr.

---

[134] *Id.*
[135] Baratta Depo., p. 46; Baratta Report, p. 5.
[136] Pl. Depo., p. 5
[137] *Daubert*, 509 U.S. at 592.

Baratta could not identify the number of vehicles that were involved in accidents with 18-wheelers; he was unable to say how many vehicles hit a barrier wall; he only reviewed vehicles involved in single-impact collisions; and the vehicles he examined, while they had similar damage to Plaintiff's vehicle, had "drastically" different Delta Vs from Plaintiff's accident. But these arguments incorrectly suggest Dr. Baratta cannot apply the results of similar peer-reviewed studies to the facts of this case and instead must compare only tests involving the exact same facts. Dr. Baratta reviewed approximately 40 peer-reviewed biomechanical studies related to human motion and injury mechanisms. The 40 studies formed the basis of his methodologies, data, calculations, and analyses. In his deposition, Dr. Baratta explained the reasons Plaintiff's arguments were irrelevant or unimportant to his analysis and how the peer-reviewed studies apply to and support his opinions.[138] Plaintiff may challenge any inconsistencies on cross-examination for the jury to consider.

Finally, Plaintiff contends the studies insufficiently support Dr. Baratta's opinion that a knee injury—specifically a meniscus tear—is not consistent with the forces of this accident. Plaintiff argues Dr. Baratta did not perform any tests, none of the studies he consulted involved any knee injuries, and he did not know the angle at which Plaintiff was seated in her car at the time of impact. But Dr. Baratta explained in his deposition why Plaintiff's contentions were irrelevant to his conclusion. He testified that it is a generally accepted principle in the field of biomechanics that three physical factors must be present for a meniscal tear to result: compression (load bearing) across the knee combined with flexion (bending) and torsion (twisting).[139] A driver seated in a vehicle could not have the necessary

---

[138] Baratta Depo., pp. 59-66.
[139] *Id.* at p. 83.

level of flexion, absent bending her leg up underneath herself and sitting on it, nor could she have the necessary compression if she is sitting in the driver's seat, nor would torsion be caused by the forces on the driver. Dr. Baratta further explained that there is not substantial literature on meniscal tears in sideswipe accidents (or accidents in general) because the mechanics necessary for such injuries are not present from a biomechanical standpoint.[140] Again, Plaintiff may challenge Dr. Baratta through cross examination.

In sum, Dr. Baratta's relied-upon biomechanical methods and theories have been subject to peer review and publication, have been tested in studies involving similar accidents, and are generally accepted in the scientific community. To determine the forces involved in this accident, he examined photographs of Plaintiff's car, the video of the accident, damage reports, reports from similar accidents, and conducted a lane-merge analysis that considered the vehicle dynamics. He reviewed over 40 peer-reviewed studies with comparable circumstances and conducted his analysis using established and accepted methods of biomechanics. Thus, his opinions on the general causation of Plaintiff's injuries are sufficiently reliable. Plaintiff may raise her concerns with Baratta's sources at trial. The jury will decide how much weight to give Baratta's expert testimony and will determine whether Plaintiff's injuries were caused by the accident.

c. **Assistance to Trier of Fact**

The Court also finds Dr. Baratta's opinions will be helpful to the jury. Dr. Baratta's analysis will assist the jury in understanding the forces exerted on a person in a sideswipe collision between vehicles travelling at 30 mph and how the mechanics of the accident and

---

[140] *Id.* at p. 57.

the physical forces involved could impact the human body. Moreover, his testimony will ultimately assist the jury in determining what forces were generated in this accident and whether those forces could lead to Plaintiff's alleged injuries. Dr. Baratta's testimony concerns matters beyond the understanding of the average layperson, and it offers more than what the lawyers for the parties can argue in closing arguments. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence."[141]

## CONCLUSION

For the reasons set forth above, the Court **DENIES** Defendant Black's Special Appearance Motions for Summary Judgment [Docs. 42 & 47]; **GRANTS** Defendant Helwig's Motion for Partial Summary Judgment [Doc. 46]; **DENIES** Plaintiff's Motion to Exclude Helwig's Expert Spero G. Karas, M.D. [Doc. 45]; and **DENIES** Plaintiff's Motion to Exclude Helwig's Expert Richard C. Baratta, Ph.D [Doc. 44].

**SO ORDERED,** this 29th day of March, 2024.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[141] *Daubert*, 509 U.S. at 596.